**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Civil Action No.** |
| ) | |
| **ONE CF6-50C2 AIRCRAFT ENGINE, WITH** ) | |
| **ENGINE SERIAL NUMBER 517621,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**COMES NOW**, the plaintiff United States of America, by and through the United States Attorney for the District of Columbia, to bring this verified complaint for forfeiture in a civil action *in rem* against the defendant property, which is one General Electric (GE) aircraft engine, engine serial number (ESN) 517621. In further support of its cause, plaintiff states as follows:

## I. NATURE OF THE ACTION

1. This *in rem* forfeiture action and civil money laundering complaint arises out of an investigation by the Bureau of Industry & Security ("BIS"), Office of Export Enforcement ("OEE") of a scheme to illicitly procure sensitive products, items, and commodities from the United States, ultimately destined for Iran, for the purpose of evading U.S. export controls and sanctions. A subject of that investigation used the U.S. financial system and the U.S. aircraft industry to further their scheme. They employed sophisticated evasion techniques and front companies to disguise the true nature of their illicit business dealings, as well as to protect the on-going nature of the fraud.

2. For the reasons set forth in more detail below, the United States seeks the seizure and forfeiture of the defendant property. The defendant property is subject to seizure and

forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituted or derived from proceeds traceable to violations of a specified unlawful activity, that is, the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq.* In addition, the Defendant Asset is subject to seizure and forfeiture under the authority of the Secretary of Commerce, as codified in 22 U.S.C. § 401(a). Finally, the defendant property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in money laundering transactions and attempted money laundering transactions, in violation of 18 U.S.C. § 1956, and as asset traceable to such property.

## II.      JURISDICTION AND VENUE

3. This court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355. Pursuant to 28 U.S.C. § 1355, the act of Congress giving rise to forfeiture is 18 U.S.C. § 981(a).

4. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the District of Columbia. The asset is currently being detained in Atlanta, Georgia under the detention authority of the Export Administration Regulations (EAR), codified in 15 C.F.R. 758.7 ("Authority of the Office of Export Enforcement, the Bureau of Industry and Security, Customs Offices and Postmasters in clearing shipments").

### III.  STATUTORY AUTHORITIES

A.  The Export Administration Regulations

5. The United States Department of Commerce has the authority to prohibit or curtail the export of goods and technologies from the United States to foreign countries in order to protect, among other things, the national security and foreign policy of the United States.  The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR" or "Regulations") (see below), which restrict the export of certain goods and technologies unless authorized by the Department of Commerce through issuance of a valid export license by its Bureau of Industry and Security.  The EAR further prohibit any transaction designed to evade or avoid, or which has the purpose of evading or avoiding, said regulations, including the making of false or misleading statements or concealing a material fact in the course of the submission of documents relating to an export of goods or technologies.

6. The EAR, 15 C.F.R. 730.1, *et seq*., regulate the export of all "dual use" items, that is, items that have both a commercial application and a military or strategic use.  *See* 15 C.F.R. 730.3.  The EAR limit the export of goods and technology that could enhance foreign military capabilities, jeopardize U.S. national security, or undermine U.S. foreign policy goals.  The EAR place requirements on exporters and include a list of products, commodities, and items for which an export license is required.  *See* 15 C.F.R. § 744.

7. Whether an item requires an export license depends in part on what country the item is being exported to, who the end-user of the item is, and what the end-user intends to use the item for.  The EAR expressly requires a license applicant to disclose the names and addresses of all parties to a transaction, 15 C.F.R. § 748.4(b), including the applicant, purchaser,

intermediate consignee(s) (if any), ultimate consignee, and end-user, 15 C.F.R. § 748.5. Certain applications must be supported by documents designed to elicit information concerning the disposition of the items intended for export. *See* 15 C.F.R. § 748.9(b).

8. The EAR's authorizing statute, the Export Administration Act of 1979 ("EAA"), codified at 50 U.S.C. App. 2401-2420, expired in August 1994, and was reauthorized by Public Law 106-508, signed on November 13, 2000. The EAA lapsed again on August 20, 2001, but the Regulations have continued in full force and effect through periodic reauthorizations and successive invocations of the International Emergency Economic Powers Act ("IEEPA") (see below). On August 17, 2001, President George W. Bush issued Executive Order ("EO") 13222, in which he ordered that all provisions of the EAR "remain in full force and effect" under the IEEPA authority. EO 13222 has been extended by successive Presidential Notices, the most recent being that of August 7, 2014. *See* 79 Fed Register 46959 (August 11, 2014).

9. To violate, attempt to violate, or conspire to violate any portion of the EAR is a felony punishable by up to 20 years imprisonment under IEEPA. *See* 50 U.S.C. § 1705. The EAR makes it unlawful to engage in any conduct prohibited by, or contrary to, or to refrain from engaging in any conduct required by, the EAR. It is also unlawful to violate any order, license or authorization issued thereunder, and equally unlawful to cause, aid, abet, solicit, attempt, or conspire to commit a violation of the EAR, or any order, license, or authorization issued thereunder. The EAR prohibit the ordering, buying, removing, concealing, storing, use, sale, loan, disposition, transfer, transport, financing, forwarding, or other servicing, in whole or in part, of any item exported or to be exported from the United States, that is subject to the EAR, with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, has occurred. *See* 15 C.F.R. § 764.2(a)-(e).

10. Finally, pursuant to the EAR, it is unlawful to engage in any transaction or take any other action with intent to evade the provisions of the EAR, or any order, license, or authorization issued thereunder. *Id*. 764.2(h).

    B.      The International Emergency Economic Powers Act

11. This civil forfeiture action relates to violations of the Regulations and Executive Orders issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 *et seq*. The IEEPA gives the President certain powers, defined in § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations thereunder. *See* 50 U.S.C. § 1705(a).

    C.      Title 18, United States Code, Section 554

12. Additionally, 18 U.S.C. § 554 makes it unlawful to export or attempt to export or smuggle from the United States "any merchandise, article, or object contrary to any law or regulation of the United States . . . ." Violations of the EAR and IEEPA serve as predicate acts for a 18 U.S.C. § 554 violation.

    D.      BIS Temporary Denial Orders

13. A Temporary Denial Order (TDO) is an administrative order issued under the authorities of the EAR (15 C.F.R 766.24) and signed by the Assistant Secretary of Commerce for Export Enforcement, "temporarily denying export privileges when such an order is necessary in the public interest to prevent the occurrence of an imminent violation." 15 C.F.R 764.6(c).

14. As defined in 15 C.F.R 766.24, "a violation may be 'imminent' either in time or degree of likelihood." To indicate the likelihood of future violations, BIS may show that the violations are ". . . significant, deliberate, covert and/or likely to occur again, rather than technical or negligent . . . ." The TDO is a public document that provides notice to companies in the

United States and abroad to "cease dealing with the [named respondents of the TDO] in U.S.-origin items . . . ." 15 C.F.R 766.24(b)(3).

15. A "related person" may be added to the TDO as well "in order to prevent evasion [of the TDO] . . . ." 15 C.F.R 766.23(a). The related person is not the respondent to the TDO, but the terms of the TDO are made applicable to them because they are "related to the respondent by ownership, control, position of responsibility, affiliation, or other connection in the conduct of the trade or business." 15 C.F.R 766.23(a).

## IV.   PROBABLE CAUSE FOR FORFEITURE

A.   Overview

16. This civil forfeiture action relates to one aircraft jet engine, ESN 517621, currently being detained by the OEE pursuant to the EAR. The engine was being exported to Kral Aviation (also known as Kral Havacilik Ic Ve Dis Ticaret Ltd.) ("Kral") of Istanbul, Turkey by a Miami, Florida-based company, "Company A."

17. Kral is a firm that purchases and sells civil aviation parts and components. Kral has never received approval for an export license from BIS. Between March 2011 and July 2012, Kral received at least 42 exports of U.S.-origin aircraft parts valued at over $2.1 million, some of which required a BIS license.

18. During the course of its investigation, OEE developed evidence that Kral supplied many of these U.S.-origin parts to Mahan Air of Iran. Mahan Air, its officers, affiliates, aircraft, and Mahan Air-controlled front companies around the world have been sanctioned by OFAC. Pursuant to Executive Order 13224, OFAC listed Mahan Air as a Specially Designated Global Terrorist ("SDGT") in October 2011 because Mahan Air provided financial, material,

and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF).

### B. Kral's Previous Attempt to Get a BIS License and Assertion of Iranian Representation

19. In or about March 2012, Kral attempted to obtain controlled U.S.-origin civil aviation parts. A U.S. exporter, "Company B," notified Kral that a BIS license was required. Company B then applied for such license. After BIS raised concerns regarding the intended end-user of the IRUs, Kral notified Company B that it was cancelling the order.

20. On April 22, 2011, a U.S. exporter ("Company C") disclosed to the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") that Kral Aviation had admitted to Company C that they are a supplier for Iranian aircraft. Company C understood Kral to be a Turkish extension of Zagros Airlines ("Zagros").

21. Zagros is an Iranian airline company. On August 15, 2011, pursuant to the EAR, Zagros was added to the BIS Entity List. *See* 76 Fed. Register 50408. Inclusion on the BIS Entity List triggers heightened export license requirements. There is a presumption of denial for all license applications where Zagros is a party to the transaction. *See* 15 CFR § 744.11(a).

### C. Related Civil Forfeiture Action

22. The United States Attorney's Office for the District of Columbia filed a related civil forfeiture action against three Inertial Reference Units (IRUs) in November 2013. The complaint alleged that Kral attempted to export the defendant IRUs to Turkey without obtaining the requisite licenses. During the course of its investigation, law enforcement learned that these IRUs were believed to be destined for Iran. The government suspects that the purchase of these IRUs was in some part for the benefit of Mahan.

23. As no claims were filed, the Government moved for default judgment, and an Order of Forfeiture was issued by the Honorable Judge Christopher R. Cooper on May 15, 2014.  (*See United States of America v. Three Inertial Reference Units Part Number 461800-03002203, with serial numbers 0451, 0116, and 0127*, D.D.C. Docket Number 1:13-cv-01751-CRC).

   D.     Mahan Air TDO and U.S. Government Sanctions

24. Mahan Air is an Iranian airline located at Mahan Tower, No. 21, Zaadegan Street, M.A. Jenah Expressway, Tehran, Iran.  OEE has obtained evidence of a significant business relationship between Kral and Mahan Air.  Over the course of their business association, Kral has supplied U.S.-origin aviation parts to Mahan Air, in violation of multiple statutes and the EAR.  Mahan Air used its relationship with Kral to conceal the fact that many of Kral's purchases of U.S.-origin aviation equipment were re-exported to Iran.  Kral made false representations to the U.S. exporters at the time of purchase, claiming that its shipments would remain in Turkey, when in reality they were re-exported to Iran.

25. Mahan Air is subject to a Temporary Denial Order (TDO) issued by the Assistant Secretary of Commerce for Export Enforcement.  The initial TDO was signed on March 17, 2008.  The TDO was renewed subsequently in 2009, 2010, 2011, 2012, 2013, and most recently on July 22, 2014.  At all times, the TDO has named Mahan Air and other related parties.

26. The TDO prohibits Mahan Air and its related parties, including those "acting for or on their behalf, any successors or assigns, agents, or employees" from "directly or indirectly, participat[ing] in any way in any transaction involving any commodity, software or technology . . . exported or to be exported from the United States that is subject to the Export Administration Regulations . . . ." (*See* BIS TDO Renewal Order, Mahan Air, et al., July 22, 2014, at IV).

### E.    Evidence of Diversion to Iran & Mahan Air

27. During the course of its investigation of transshipment and diversion of U.S.-origin aircraft products to Iran, OEE learned through a source of information, that has proven to be reliable, that Kral was involved in the procurement, acquisition, and re-export of U.S.-origin products on behalf of Mahan Air and other prohibited parties in Iran.

28. The source of information revealed that between February 2012 and October 2012, Kral received approximately $393,000 from Mahan Air as payment for purchases made by Kral on Mahan Air's behalf.

### F.    ESN 517621 Transaction Summary

29. The defendant property is a U.S.-manufactured CF6-50C2 aircraft engine, identified as ESN 517621.  This ESN is a unique identifier given to it by the manufacturer.

30. During the course of its investigation, OEE obtained information from a reliable source that revealed a Mahan Air employee discussing, on or about June 5, 2012, the purchase of the defendant property (ESN 517621).  The document revealed Mahan Air's interest in, and direction of, the purchase of this engine for its air fleet in Iran.

31. On or about June 18, 2012, Kral signed a Letter of Intent ("LOI") with U.S. Company A for the purchase of several U.S.-origin engines, including the defendant property.  Pursuant to the terms of the LOI, on or about June 19, 2012, Kral wired $100,000 into a trust account at a financial institution in Florida, as a down payment for the purchase of the defendant property.  These funds were transmitted from a place outside of the United States, into a place inside the United States.

32. On or about June 21, 2012, Mahan Air representatives sent a LOI to Kral for the purchase of ESN 517621 and one other engine.

33. On or about July 2, 2012, Kral had the defendant property inspected by U.S. "Company D." Kral wired $5,000 from a Turkish financial institution to a U.S. financial institution as payment to Company D for the cost of inspecting the defendant property. OEE learned that Kral then invoiced Mahan Air on or about July 19, 2012, for the cost of this inspection of the defendant property.

34. On or about July 11, 2012, a Kral representative forwarded an invoice for ESN 517621 to Mahan Air. The purchaser is listed as Asian Aviation Logistics of Thailand, a Mahan Air-owned and controlled entity. The price of ESN 517621 is listed as $1,060,000.

35. On or about July 19, 2012, Kral and Company A executed an engine sale agreement for the defendant property (ESN 517621). The agreement contained clauses that included a definition of "SDN Lists" and a warranty by Kral that it did not represent or was not otherwise acting for, or on behalf of, a prohibited party.

36. OEE learned that on or about that same date, July 19, 2012, a Kral representative communicated with Mahan Air officials about the June 14, 2012 purchase order for the defendant property, with a declared value of $1,060,000.

37. On or about July 20, 2012, Kral caused the wire transfer of $710,000 to be made from a financial institution in Turkey into a trust account at a financial institution in Florida for the benefit of Company A. This payment represented the outstanding balance due for the purchase of the defendant property (ESN 517621).

38. Upon receipt of the full payment for the defendant property (ESN 517621), Company A made arrangements via a freight forwarder to export the defendant property.

39. Shortly thereafter, OEE learned from a reliable source of information of the intended export of the defendant property.  On July 25, 2012, an OEE Special Agent ordered the defendant property detained under the authorities of the EAR, 15 C.F.R 758.7.

40. On or about July 26, 2012, the freight forwarder confirmed with the cargo carrier that the defendant property was to be stopped in Luxembourg, and was not to continue on to Turkey, per the O.E.E. detention order.

41. OEE learned from a reliable source that a Kral representative informed Mahan Air officials on that same date (on or about July 26, 2012) that the defendant property was being shipped to Luxembourg, after which it would then be shipped to Turkey.  The Kral representative also informed the Mahan Air officials that Kral had already sent the transit documents relevant to the defendant property to Mahan.

42. Ultimately, the freight forwarder secured the defendant property at a facility in Atlanta, Georgia controlled by the cargo carrier, where it remains to date.

43. The defendant property has a declared value of $810,000.

44. The above information corroborates that the purchase of the defendant property was for the benefit of Mahan Air.

## V.    COUNT ONE

45. The statements made in the above paragraphs are restated as if fully set forth herein.

46. The defendant property was used to promote a violation of the IEEPA, specifically 50 U.S.C. § 1705, which makes it a crime to willfully attempt to commit, conspire to commit, or aid and abet in the commission of any violation of the EAR.

47. As such, the defendant property is subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to a conspiracy to violate the IEEPA.

### VI.    COUNT TWO

48. The statements made in the above paragraphs are restated as if fully set forth herein.

49. Persons in Turkey, as well as Iran, conspired to transmit and transfer payments for the defendant property to a place inside the U.S. from or through a place outside the U.S., with the intent to promote the carrying on of violations of the IEEPA, EAR, and 18 U.S.C. § 554, in violation of 18 U.S.C. § 1956(h) and (a)(2)(A).

50. As such, the defendant property is subject to forfeiture to the United States, pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in transactions in violation of 18 U.S.C. § 1956(h), or as any property traceable to such property.

### VII.    COUNT THREE

51. The statements made in the above paragraphs are restated as if fully set forth herein.

52. Persons in Turkey, as well as Iran, conspired to attempt to export and ship from the United States articles, namely the defendant property, in violation of law, namely the IEEPA and EAR, all in violation of 22 U.S.C. § 401(a).

53. As such, the defendant property is subject to forfeiture to the United States, pursuant to 22 U.S.C. § 401(a).

## VIII.  CONCLUSION

**WHEREFORE**, the United States of America prays that a warrant for arrest *in rem* and notice issue on the defendant property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring that the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

 */s/ Ronald C. Machen Jr.*
RONALD C. MACHEN JR.,
D.C. Bar No. 447889
United States Attorney

*/s/ Zia M. Faruqui*
Zia M. Faruqui,
D.C. Bar No. 494990
Assistant United States Attorney
555 4th Street, N.W., Fourth Floor
Washington, D.C.  20530
zia.faruqui@usdoj.gov
(202) 252-7117

## **VERIFICATION**

      I, COLIN A. MAY, a Special Agent with the OEE, United States Department of Commerce, Bureau of Industry and Security, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that everything represented herein is true and correct.

Executed on this  22nd  day of August 2014.


*/s/ Colin May*
COLIN A. MAY
Special Agent
Office of Export Enforcement